Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Bridget Psarianos (AK Bar No. 1705025)
Brian Litmans (AK Bar No. 0111068)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
Phone: (907) 276-4244
Fax: (907) 276-7110
sbostrom@trustees.org
bbrisson@trustees.org
bpsarianos@trustees.org
blitmans@trustees.org

*Attorneys for Plaintiffs*

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| NORTHERN ALASKA ENVIRONMENTAL CENTER, ALASKA WILDERNESS LEAGUE, CONSERVATION LANDS FOUNDATION, DEFENDERS OF WILDLIFE, SIERRA CLUB, and THE WILDERNESS SOCIETY,<br><br>               Plaintiffs,<br><br>      v.<br><br>DAVID BERNHARDT, in his official capacity as Secretary of the Interior, WILLIAM PERRY PENDLEY, in his official capacity as the official exercising the authority of the Director of the Bureau of Land Management, UNITED STATES DEPARTMENT OF THE INTERIOR, and BUREAU OF LAND MANAGEMENT,<br><br>               Defendants. | Case No. 3:20-cv-00207-HRH |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
(National Environmental Policy Act, 42 U.S.C. §§ 4321–4370h; Naval Petroleum
Reserves Production Act, 42 U.S.C. §§ 6501–6508; Administrative Procedure Act, 5
U.S.C. §§ 702–706)

Plaintiffs Northern Alaska Environmental Center, Alaska Wilderness League,

Conservation Lands Foundation, Defenders of Wildlife, Sierra Club, and The Wilderness

Society file this Complaint for Declaratory and Injunctive Relief, and hereby allege:

## I.     NATURE OF THE CASE

1.      At over 23-million acres, the National Petroleum Reserve–Alaska

(Reserve) is the largest single block of federal public land in the United States. It

provides habitat for numerous fish and wildlife species, many of which are vitally

important for subsistence use. These include two caribou herds, polar bears, raptors, and

millions of migratory birds that travel to the Reserve each year. Areas in the Reserve such

as Teshekpuk Lake, the Colville River, and the Utukok Uplands have been recognized for

decades as being particularly significant because of their importance to wildlife.

2.      Under the management plan for the Reserve adopted in 2013, called the

Integrated Activity Plan (IAP), the Bureau of Land Management (BLM) closed

approximately half of the Reserve to oil and gas activity because of the need to protect

sensitive areas like Teshekpuk Lake. Despite this prior decision and BLM's statutory

obligation to provide maximum protection for wildlife, subsistence, and other important

values in the Reserve, in 2018 BLM stated its intent to adopt a revised IAP that opened

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 2 of 31

more of the Reserve to oil and gas. To that end, the agency, issued a final Environmental Impact Statement (EIS) in June, identifying a preferred alternative that would dramatically reduce protections for sensitive species and habitats across the Reserve.

3.      In issuing the final EIS for the revised IAP, BLM and the United States Department of the Interior (DOI) failed to comply with multiple statutes and regulations that impose important protections for the Reserve. These laws require careful consideration of the impacts of BLM's decision, the consideration of alternatives and mitigation measures to protect the Reserve, and that BLM adopt mitigation measures and provide maximum protection for areas with significant wildlife and other values.

4.      This action seeks declaratory and injunctive relief against DOI and BLM for their failure to comply with the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370h and its regulations, the Naval Petroleum Reserves Production Act (NPRPA), 42 U.S.C. §§ 6501–6508 and its regulations, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 702–706.

5.      Plaintiffs bring this action to invalidate BLM's unlawful final EIS and any related or subsequent decisions, including BLM's forthcoming Record of Decision.

6.      Plaintiffs seek vacatur, declaratory, and injunctive relief to compel agency action unlawfully withheld and because BLM's decision is arbitrary, capricious, an abuse of discretion, not in accordance with the law, in excess of statutory authority, and without observance of the procedure required by law. 5 U.S.C. § 706.

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 3 of 31

## II.  JURISDICTION AND VENUE

7.     This Court has jurisdiction over the parties and subject matter of this action

under 28 U.S.C. §§ 1331 (federal question), 1361 (action to compel mandatory duty),

2201 (declaratory relief), and 2202 (injunctive relief). Plaintiffs have a right to judicial

review under the APA, 5 U.S.C. §§ 701–706, and this action is brought in accordance

with the terms of the NPRPA, 42 U.S.C. § 6506a(n)(1).

8.     Defendants' sovereign immunity is waived pursuant to the APA, 5 U.S.C. §

702.

9.     Venue is proper in the District of Alaska under 28 U.S.C. § 1391 because a

substantial part of the events giving rise to the claims occurred within the BLM Alaska

State and Arctic District Offices and because the public lands at issue in the case are

located in Alaska.

## III.  PARTIES

### Plaintiffs

10.    Plaintiff Northern Alaska Environmental Center (Northern Center) is an

Alaska nonprofit environmental organization founded in 1971 with over 900 members,

sixty percent of whom are located throughout Alaska. The Northern Center's mission is

to promote the conservation of the environment and sustainable resource stewardship in

Interior and Arctic Alaska through education and advocacy. One of the Northern Center's

major focus areas is its Arctic program. The Northern Center actively works to protect

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 4 of 31

the Arctic, its communities, and vital wildlife habitats and wildlands, including areas like Teshekpuk Lake in the Reserve, from the harms associated with oil and gas development. The Northern Center also works to amplify the voices of local populations impacted by development. The Northern Center participates in agency decision-making processes related to oil and gas development in the Arctic, including the challenged action. The Northern Center provides its members and the public with information about the impacts of oil and gas on the Arctic, enabling members to participate as well.

11. Plaintiff Alaska Wilderness League (AWL) is a nonprofit organization founded in 1993 with approximately 100,000 members, including many members in Alaska. AWL's mission is to galvanize support to secure vital policies that protect and defend America's last great wild public lands and waters. AWL advocates for the protection of Alaska's wild lands and waters and works to prevent environmental degradation on Alaska's public lands and waters, including the Reserve. AWL actively works on issues related to oil and gas development and the protection of Special Areas and values in the Reserve. AWL also works closely with communities in the Arctic impacted by development. AWL is committed to honoring the human rights and traditional values of the people of the Arctic.

12. Plaintiff Conservation Lands Foundation (CLF) is a nonprofit organization established in 2007, and is the only organization in the country dedicated to safeguarding the National Conservation Lands – i.e., the premier public lands, rivers, and trails

*N. Alaska Envtl. Ctr. v. Bernhardt*
Case No. 3:20-cv-00207-HRH                                                                 Page 5 of 31

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 5 of 31

managed by the Bureau of Land Management. CLF's mission is to protect, restore, and expand the system of National Conservation Lands through education, advocacy, and partnerships. CLF created, developed and has grown the Friends Grassroots Network, a collection of more than seventy local groups and organizations from around the nation dedicated to protecting, restoring, and expanding BLM's conservation mission. CLF actively works to protect Special Areas and values in the Reserve, such as the Teshekpuk Lake Special Area, and to reduce the impacts of oil and gas development in the Reserve.

13.     Plaintiff Defenders of Wildlife (Defenders) is a nonprofit organization founded in 1947 with approximately 1.8 million members and supporters, including over 6,000 in Alaska. Defenders has offices across the country, including Anchorage. Its mission is to protect all native animals and plants in their natural communities. Defenders works to protect and restore key species and their habitats throughout North America through education, advocacy, litigation, and other efforts. It advocates for the sound management of our public lands and wildlife, including the Reserve. Defenders prioritizes imperiled species and also works to reduce human-wildlife conflicts. Defenders has actively worked to promote wildlife habitat conservation and public land management in Alaska, including in the Arctic. Defenders serves on the U.S. Fish and Wildlife Service's Polar Bear Recovery Advisory Work Group on Reducing Human-Polar Bear Conflicts. Defenders also works to reduce any conflicts or impacts to polar

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 6 of 31

bears and other wildlife that may arise from current or proposed development activities in the Reserve and elsewhere in the Arctic.

14.    Plaintiff Sierra Club is the nation's oldest and largest grassroots environmental organization. The Sierra Club is a national nonprofit organization of approximately 799,000 members dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Alaska Chapter of the Sierra Club has approximately 1,800 members. The Sierra Club's concerns encompass a variety of environmental issues in Alaska and beyond, and the organization has long been active on issues related to oil and gas activities in America's Arctic, including the Reserve. Sierra Club members use the public lands in the Arctic and Reserve for quiet recreation, aesthetic pursuits, and spiritual renewal. These areas would be threatened by increased oil and gas development that could result from the revised IAP.

15.    Plaintiff The Wilderness Society is a nonprofit organization headquartered in Washington, D.C., with offices throughout the country, including a six-person staff in Alaska. Its overall mission is to unite people to protect America's wild places. The Wilderness Society has close to a million members and supporters, many of whom are in Alaska. The goal of its Alaska program is to permanently protect special places in

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 7 of 31

America's Arctic and sub-Arctic, including in the Reserve. The Wilderness Society has been engaged in Reserve conservation efforts for decades, and has consistently participated in public processes associated with Reserve land use decisions. Staff have visited the Northeast region of the Reserve on numerous occasions to assess conservation values and to conduct scientific research. Among other areas of focus, staff from The Wilderness Society work to advance scientific understanding and conservation policy for highly migratory caribou and fish resources that utilize much of the landscape to complete their life cycles.

16.     Plaintiffs' members, supporters, staff, and board members work, visit, and recreate in and around the Reserve and plan to return to the Reserve. Plaintiffs' members and supporters also live in and around the Reserve. Plaintiffs' members and supporters use the Reserve and depend on the health of the subsistence resources in the Reserve to support their subsistence way of life. Plaintiffs' members, supporters, staff members, and board members have health, subsistence, cultural, economic, recreational, scientific, environmental, aesthetic, educational, conservation, and other interests in the Reserve, and they enjoy or use wildlife that inhabit the Reserve.

17.     Plaintiffs' interests, and their members' and supporters' interests in use and enjoyment of the areas, have been, are being, and will continue to be adversely affected by oil and gas activities in the Reserve. The expanded oil and gas activities allowed by the revised IAP will potentially degrade and harm wildlife and habitat, thereby harming

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 8 of 31

the interests of Plaintiffs and their members and supporters. Oil and gas activities enabled by the revised IAP will also impede members' ability to access subsistence resources in the region. The reduction in protections and expansion of areas open to oil and gas and other infrastructure will adversely affect the natural environment and wildlife used and enjoyed by Plaintiffs' members and supporters and harm the interests of Plaintiffs and their members and supporters.

18.    Plaintiffs actively work to protect the Reserve's values and resources and any reduction in protections for areas in the Reserve and expansion of oil and gas activities will cause Plaintiffs direct, immediate, and irreparable injury. Damage to the Reserve poses a threat to Plaintiffs' programs and work, will frustrate their missions, and will drain their resources by forcing them to divert resources away from their core missions.

19.    Plaintiffs and their members have a procedural interest in Defendants' full compliance with planning and decision-making processes under NEPA.

20.    These are actual, concrete, and particularized injuries caused by Defendants' failure to comply with their mandatory duties under NEPA, the NPRPA, and the APA.

21.    BLM's analysis in the revised IAP EIS violates and is contrary to NEPA, the NPRPA, and the APA. This threatens imminent, irreparable harm to the interests of the Plaintiffs and their members. These actual, concrete injuries suffered by the Plaintiffs

*N. Alaska Envtl. Ctr. v. Bernhardt*
Case No. 3:20-cv-00207-HRH                                      Page 9 of 31

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 9 of 31

and their members and supporters are fairly traceable to BLM's adoption of the revised IAP EIS and BLM's failure to adhere to mandated procedures and standards. These injuries would be redressed by the relief sought in this case.

Defendants

22. Defendant David Bernhardt is the Secretary of the Interior and is being sued in his official capacity. Secretary Bernhardt is the official ultimately responsible under federal law for ensuring that the actions and decisions of BLM comply with all applicable laws and regulations.

23. Defendant William Perry Pendley is the official who is exercising the authority of the Director of BLM and is being sued in his official capacity. Mr. Pendley is responsible for the supervision and management of all decisions, operations, and activities of BLM.

24. Defendant DOI is an agency of the United States responsible for oversight of BLM.

25. Defendant BLM is an agency within DOI and is responsible for managing federal lands and the subsurface mineral estate underlying federal lands in the Reserve. BLM is responsible for implementing and complying with federal law, including the federal laws related to the adoption of the revised IAP challenged in this action.

_____

*N. Alaska Envtl. Ctr. v. Bernhardt*
Case No. 3:20-cv-00207-HRH                                    Page 10 of 31

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 10 of 31

# IV. STATUTORY AND REGULATORY BACKGROUND

26. NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA's twin aims are to ensure that federal agencies take a hard look at the environmental impacts of their proposed actions before taking an action and to ensure that agencies provide relevant information to the public so the public can play a role in both the decision-making process and the implementation of the decision. 40 C.F.R. § 1502.1. By focusing the agency's attention on the environmental consequences of its proposed action, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after an agency has committed resources. 42 U.S.C. § 4332(2)(C).

27. NEPA requires federal agencies to prepare a detailed EIS for every major federal action that will have a significant impact on the quality of the human environment. 42 U.S.C. § 4332. Such a statement is required to "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

28. NEPA requires federal agencies to include alternatives to the proposed action within an EIS. 42 U.S.C. § 4332(2)(C). The alternatives analysis is the "heart" of a NEPA document, and NEPA's implementing regulations direct BLM to "[r]igorously explore and objectively evaluate all reasonable alternatives," including appropriate

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 11 of 31

mitigation measures to reduce the potential impacts of the action on the environment. 40 C.F.R. § 1502.14. If an agency adds a new alternative or makes changes to an existing alternative after release of the draft EIS, the agency may be required to issue a supplement to the draft EIS if the alternative is not within the spectrum of alternatives discussed in the draft. Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,035 (Mar. 23, 1981).

29.     NEPA also requires that agencies take a "hard look" at the direct, indirect, and cumulative environmental effects of the alternatives, including the proposed action, as well as the means to mitigate against those adverse environmental consequences. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.16, 1508.7. "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998); *see* 40 C.F.R. § 1502.22(a).

30.     A cumulative impact is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

31.     NEPA requires BLM to consider mitigation measures in an EIS, including measures outside the jurisdiction of the action agency. *Id.* §§ 1502.16(h), 1505.2(c).

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 12 of 31

32.     NEPA requires that agencies evaluate the environmental consequences of a project, beginning at an early stage of the planning process. Agencies can prepare a high-level programmatic EIS with sufficient detail to foster informed decision-making, and defer in-depth evaluation of the site-specific impacts until the agency reaches the point where it proposes to make a critical decision to act on site development. *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982); *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 801 (9th Cir. 2003).

33.     Agencies can tier to other NEPA documents to cut down on repetitive discussions and focus on the issues ripe for decision at each level of environmental review. 40 C.F.R. § 1502.20. However, tiering is improper if the underlying documents do not contain sufficient analysis or do not adequately account for the effects of a proposed action on the environment. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 810–12 (9th Cir. 1999).

34.     The NPRPA governs BLM's management of the surface values and subsurface resources in the Reserve. 42 U.S.C. §§ 6501–6508. The NPRPA requires BLM to consider and protect the ecological and other values of the Reserve. *Id.* §§ 6503(b), 6504(a), 6506a(b). Under the NPRPA, Congress instructed the Secretary of the Interior to designate as Special Areas any areas containing "significant subsistence, recreational, fish and wildlife, or historical or scenic values." *Id.* § 6504(a). The Secretary

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 13 of 31

is required to ensure "maximum protection" for Teshekpuk Lake and other areas

designated as having these significant values. *Id.*

35.     The NPRPA also requires BLM to include any conditions, restrictions, and

prohibitions necessary to mitigate reasonably foreseeable and significant adverse effects

on the surface resources in the Reserve. *Id.* § 6506a(b). To ensure the protection of these

resources, Congress directed BLM to adopt regulations to ensure the agency adequately

protects sensitive resources in the Reserve. *Id.* § 6503(b).

36.     In its regulations implementing the NPRPA, BLM defined "Special Areas"

as "areas within the reserve identified by the Secretary of the Interior as having

significant subsistence, recreational, fish and wildlife, or historical or scenic value and,

therefore, warranting maximum protection of such values to the extent consistent with the

requirements of the Act for the exploration of the Reserve." 43 C.F.R. § 2361.0-5(f). Its

regulations governing Special Area management mandate that "[m]aximum protection

measures shall be taken on all actions within the [Utukok] River Uplands, Colville River,

and Teshekpuk Lake special areas, and any other special areas identified by the Secretary

as having significant subsistence, recreational, fish and wildlife, or historical or scenic

value." *Id.* § 2361.1(c).

37.     Courts review agency actions under the APA. 5 U.S.C. §§ 702, 704.

38.     Under the APA, Courts "hold unlawful and set aside agency actions,

findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 14 of 31

otherwise not in accordance with law," in excess of statutory authority, or made "without observance of procedure required by law." *Id.* § 706(2).

## V.    FACTS

<u>The Exceptional Values of the Reserve</u>

39.    At approximately 22.8 million acres — an area roughly the size of Indiana — the Reserve is the largest single federal public land unit in the country. The Reserve provides rich habitat for caribou, grizzly and polar bears, wolves, and a range of migratory birds and waterfowl. It is also home to the Western Arctic and Teshekpuk Lake Caribou Herds, which provide key subsistence resources to numerous communities in the Reserve and across northwest Alaska.

40.    President Warren G. Harding originally set aside the Reserve in 1923 as a petroleum reserve for the U.S. Navy. In 1976, it was re-designated and Congress passed the NPRPA — a new law recognizing the exceptional ecological values in the Reserve. The law instructed the Secretary of the Interior to designate any areas containing significant subsistence, recreational, fish and wildlife, or historical or scenic values as special areas and to provide "maximum protection" for those values. 42 U.S.C. § 6504(a).

41.    Based on this authority, the Secretary designated multiple Special Areas — including the Teshekpuk Lake and Colville River Special Areas — to ensure maximum protection of the environment, fish and wildlife, and historical or scenic values. 42 U.S.C.

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 15 of 31

§ 6504(a); National Petroleum Reserve in Alaska Designation of Special Areas, 42 Fed. Reg. 28,723 (June 3, 1977).

42.     The Colville River Special Area was initially designated to protect peregrine falcons and their nesting habitat, and the Teshekpuk Lake Special Area was designated to protect "important nesting, staging, and molting habitat" for waterfowl and other migratory birds. National Petroleum Reserve in Alaska Designation of Special Areas, 42 Fed. Reg. 28,723 (June 3, 1977).

43.     Consistent with its regulations governing Special Areas, the Secretary explained that "steps to minimize adverse impacts on existing resources values will be required and implemented" for proposed activities in these Special Areas. National Petroleum Reserve in Alaska Designation of Special Areas, 42 Fed. Reg. 28,723 (June 3, 1977). Over the years, the boundaries of the Special Areas have been expanded and the Secretary has designated new Special Areas. *See, e.g.*, Designation of Addition to Special Areas in National Petroleum-Alaska; Alaska, 70 Fed. Reg. 9,096 (Feb. 24, 2005).

44.     Teshekpuk Lake is one of the most productive wetland complexes in the Arctic and provides vital nesting habitat for hundreds of thousands of migratory birds. The Teshekpuk Lake area, along with the neighboring Smith Bay marine habitat, supports the highest density of shorebirds in the circumpolar Arctic, including threatened spectacled eiders, Steller's eiders, yellow-billed loons, dunlins, and American golden-plovers. As many as 35,000 greater white-fronted geese and 37,000 brant molt in the

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 16 of 31

area, as do thousands of Canada geese and Snow geese. This region is also the primary calving grounds for the Teshekpuk Lake Caribou Herd.

45.     The Colville River Delta is the largest and most ecologically rich river delta in northern Alaska. The cliffs along the Colville River provide critical nesting sites and adjacent hunting areas for peregrine falcons, gyrfalcons, golden eagles, and rough-legged hawks.

The 2013 IAP & Subsequent Developments

46.     BLM adopted the first-ever management plan covering the entire Reserve with its 2013 IAP. Prior plans covered only the northeast or northwest planning areas. The 2013 IAP set out broad decisions for how BLM would manage resources and the values in the Reserve. As part of the process for adopting the management plan, BLM prepared an EIS pursuant to NEPA to look at various management and land-allocation alternatives for the Reserve. In issuing the Record of Decision (ROD) for the 2013 IAP, BLM adopted Alternative B-2.

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 17 of 31

47. As depicted in the map below, although Alternative B-2 protected many of the wildlife, habitat, and subsistence values of the Reserve, it also made approximately 11.8-million acres — approximately 52% — of the Reserve available for oil and gas leasing and development. The 2013 ROD also incorporated stipulations and best management practices applicable to oil and gas and other activities in the Reserve.



48. The 2013 IAP expanded the Teshekpuk Lake Special Area from 1.75-million acres to 3.65-million acres and expanded its purposes to include protecting caribou and shorebird habitat. It closed approximately 3.1 million acres of the Teshekpuk Lake Special Area to oil and gas leasing because of the area's importance to subsistence users and wildlife, including the Teshekpuk Lake Caribou Herd.

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 18 of 31

49.     The 2013 IAP expanded the protections for the Colville River Delta by prohibiting permanent oil and gas facilities within two miles of the Colville, Kikiakrorak, and Kogosukruk Rivers. BLM also expanded the purpose of the Colville River Special Area to protect all raptor species.

50.     In seeking to balance the wildlife, habitat, and subsistence values of the Reserve with the opportunities for oil and gas leasing and development, BLM relied on a 2010 U.S. Geological Survey (USGS) resource assessment that dramatically reduced the oil and gas estimates for the Reserve from previous estimates. The 2010 resource assessment estimated the Reserve contained only around 896 million barrels of technically recoverable oil. In a related economic analysis, USGS even further reduced these estimates to state that only 491 million barrels of economically recoverable oil would be discovered in the Reserve in the future. The 2013 IAP based its cumulative impacts analysis and assumptions about the foreseeable level of development on these estimates.

51.     After adoption of the 2013 IAP, BLM approved ConocoPhillips Alaska, Inc.'s (ConocoPhillips) drilling permit for the Greater Mooses Tooth 1 (GMT-1) development. The project included a drilling pad and 7.6-mile road that would extend ConocoPhillips' existing oil and gas infrastructure at Alpine (on adjacent lands east of the Reserve) and Colville Delta-5 (on private land within the Reserve) further west into the Reserve. In making the decision, BLM waived a protective provision in the 2013 IAP that

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 19 of 31

would have kept oil and gas infrastructure out of an established buffer around Fish Creek, an important subsistence use area for the community of Nuiqsut.

52.    In its GMT-1 decision, BLM recognized that there would be significant impacts to subsistence users and other values from the project that could not be fully mitigated by the best management practices and stipulations in the 2013 IAP. BLM also recognized these impacts were likely to continue to occur and to be exacerbated by future development in the Reserve.

53.    BLM subsequently issued a decision authorizing ConocoPhillips' Greater Mooses Tooth 2 (GMT-2) project in the Reserve. The GMT-2 project extends the footprint of development into the Reserve and further worsens the impacts to subsistence and other values.

54.    In early 2017, ConocoPhillips announced a major discovery at the Willow prospect located to the west of GMT-2. The Willow prospect is estimated to hold between 400 and 750 million barrels of oil, with production projected to be over 160,000 barrels of oil per day.

55.    BLM is in the process of permitting ConocoPhillips' proposed Willow development. BLM released a draft EIS for public review in fall 2019, a supplemental draft EIS in March 2020, and the final EIS on August 14, 2020. As proposed, ConocoPhillips would construct a new central processing facility and infrastructure pad in the Reserve, up to five satellite drill pads with up to fifty wells on each pad, an airstrip,

*N. Alaska Envtl. Ctr. v. Bernhardt*
Case No. 3:20-cv-00207-HRH                                      Page 20 of 31

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 20 of 31

gravel roads connecting back to the GMT-1 and GMT-2 developments, and a gravel mine within the Reserve. The proposal is within and adjacent to the Teshekpuk Lake Special Area and will substantially increase the amount of industrial activity occurring in and around the community of Nuiqsut. ConocoPhillips indicated it intends to bring Willow into production by 2024.

56.    There have been a number of other discoveries and development activities since the adoption of the 2013 IAP. Caelus Energy announced a substantial find in state waters off the coast of the Reserve in Smith Bay in 2016. Armstrong Energy, Inc. (Armstrong) also upgraded its resource estimates at the Nanushuk development to a billion-plus-barrel oil prospect in 2017. Nanushuk, which Armstrong states is the largest onshore oil discovery in three decades, lies on state lands immediately adjacent to the Reserve and the community of Nuiqsut. Oil Search, which took over Armstrong's interest in the Nanushuk project, is moving forward with its development plans for Nanushuk and estimates first production in 2023.

57.    Because of the number of discoveries in and around the Reserve after adoption of the 2013 IAP, including Willow, USGS issued an updated resource assessment in 2017. That revised assessment increased the undiscovered oil estimates for areas in and near the Reserve nearly six-fold, from approximately 1.5 billion barrels in 2010 up to 8.7 billion barrels of technically recoverable oil.

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 21 of 31

58.     Since the adoption of the 2013 IAP, BLM has conducted annual lease sales in the Reserve. The results of the lease sales have varied, with some resulting in the sale of only a handful of leases and others resulting — in the case of the 2016 and 2019 lease sales — in the sale of over 613,000 and 1 million acres, respectively. Prior to conducting those lease sales, BLM only prepared Determinations of NEPA Adequacy.

59.     Under the standard terms for BLM's leases, BLM grants the exclusive right to drill and produce the oil and gas resources in the leased areas, along with the right to build and maintain necessary infrastructure and improvements.

<u>BLM's Revised IAP</u>

60.     After President Trump assumed office in January 2017, he announced a new "energy dominance" agenda for public lands management, and his Administration began working aggressively to dismantle protections for public lands and their resources to promote fossil fuel development. Then-Secretary Ryan Zinke and David Bernhardt, who was Deputy Secretary under Zinke and is now Secretary of the Interior, led the charge in that effort. To that end, Secretary Zinke issued Secretarial Order 3349, titled "American Energy Independence," which directed all bureaus within DOI, including BLM, to examine their actions restricting domestic energy development.

61.     In 2017, the Secretary of the Interior signed Secretarial Order 3352, which called for revising the 2013 IAP and opening additional areas in the Reserve to oil and gas development. BLM subsequently initiated the environmental review process to revise

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 22 of 31

the IAP in 2018. The purpose of the order was to provide for additional development of energy resources, while also eliminating regulatory burdens that purportedly hinder energy production, economic growth, and job creation.

62.     BLM released the draft EIS for the revised IAP for public comment at the end of 2019. The draft EIS considered four alternatives — one no action alternative and three action alternatives. Alternative A, the no action alternative, would leave the 2013 IAP in place. Alternative B would open 50%, or 11.4 million acres, of the Reserve to oil and gas leasing, including areas south of Teshekpuk Lake, which were closed under the 2013 IAP. This alternative also deferred new leases around Nuiqsut for ten years, in an area that companies have already mostly leased. Alternative C opened 75%, or 17.1 million acres, of the Reserve to leasing. Alternative C substantially reduced the area off limits to leasing around Teshekpuk Lake and opened areas of the Utukok Uplands Special Area to oil and gas. Alternative D opened 81% of the Reserve to oil and gas.

63.     The draft EIS listed lease stipulations and required operating procedures for both oil and gas and non-oil and gas activities. These provisions were nearly identical across all of the alternatives. The draft EIS also contained provisions broadly allowing for waivers, exceptions, and modifications to any lease stipulations.

64.     Each of the action alternatives eliminated the Colville River Special Area and reduced the size of the Teshekpuk Lake Special Area.

_____

*N. Alaska Envtl. Ctr. v. Bernhardt*
Case No. 3:20-cv-00207-HRH                                   Page 23 of 31

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 23 of 31

65. Each of the action alternatives allow for community roads to be built anywhere in the Reserve, including in areas closed to oil and gas leasing and development or subject to no surface occupancy stipulations for oil and gas leases. Each of the action alternatives also allow at least one pipeline to run through the Teshekpuk Lake Special Area to transport oil and gas from offshore development, including through areas that would otherwise be closed to oil and gas infrastructure.

66. Shortly after the release of the draft EIS, BLM held the 2019 lease sale in the Reserve. BLM sold over 92 tracts totaling just over 1 million acres. The sale was the second largest in the Reserve to date in terms of the total number of acres leased. North Slope Exploration, LLC, a subsidiary of Armstrong Energy, acquired 85 of those tracts in an area south of Teshekpuk Lake and extending toward the community of Atqasuk:

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 24 of 31



67.     Numerous commenters, including Plaintiffs, submitted comments urging

BLM not to revise the 2013 IAP to open additional areas to oil and gas development.

These comments flagged numerous concerns with the draft EIS and with BLM's failure

to conduct an adequate analysis for purposes of NEPA, consider a reasonable range of

alternatives, or protect resources and Special Areas in the Reserve as mandated by the

NPRPA. Commenters asked BLM to consider a range of additional alternatives or

components of alternatives, including alternatives that would close additional areas to

leasing or infrastructure, would shift the frequency of leasing, or would include additional

mitigation measures. Commenters also flagged that BLM failed to do an adequate

analysis of the direct, indirect, and cumulative impacts to a wide range of resources, uses,

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 25 of 31

and areas, including caribou, birds, polar bears, air, water, greenhouse gas emissions and climate change, subsistence uses and resources, and other resources and areas in and around the Reserve. Commenters flagged that BLM's EIS did not adequately account for or address the new information and range of impacts occurring in the Reserve that arose after the adoption of the 2013 IAP.

68.     BLM issued its final EIS on June 26, 2020. In the final EIS, BLM identified a new alternative — Alternative E — as its preferred alternative. Alternative E opened 18.7 million acres, or 82% of the Reserve, to oil and gas leasing and made other changes:



Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 26 of 31

69.     BLM also modified the existing alternatives that were considered in the draft EIS.

70.     In the final EIS, all the action alternatives still reduced the size of the Teshekpuk Lake Special Area and eliminated the Colville River Special Area. BLM modified the Utukok Uplands Special Area in the final EIS to encompass part of the headwaters of the Colville River.

71.     BLM relied on a hypothetical development scenario to set out what the impacts might be from different levels of oil and gas development.

72.     In the final EIS, BLM stated the EIS was intended to fulfill BLM's NEPA obligations for lease sales conducted through at least 2039 and potentially after.

73.     In response to comments calling on BLM to engage in a more in-depth analysis of the potential impacts to numerous resources and better explain the differences in impacts between the alternatives, BLM said it would not conduct that analysis at this stage.

**CLAIMS FOR RELIEF**

**COUNT I**
**(Violation of NEPA)**

74.     Plaintiffs re-allege, as if fully set forth here, each and every allegation contained in the preceding paragraphs.

75.     Pursuant to NEPA, agencies must take a "hard look" at the consequences, environmental impacts, and adverse effects of their proposed actions and evaluate

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 27 of 31

mitigation measures. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1502.14, 1502.16. NEPA requires that an EIS include a detailed analysis of the direct, indirect, and cumulative impacts of the proposed action together with the impacts of past, present, and reasonably foreseeable activities. 40 C.F.R. §§ 1502.16(a)–(b), 1508.7, 1508.8. NEPA's implementing regulations require that an EIS discuss the means to mitigate adverse environmental consequences. *Id.* §§ 1502.14(f), 1502.16(h).

76.     NEPA requires agencies to consider a reasonable range of alternatives. 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. §§ 1500.2(e), 1502.2(d)–(f), 1502.14, 1505.1(e). Agencies must, to the fullest extent possible, include "reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e). The EIS must also state how the alternatives considered will meet both NEPA and other environmental laws and policies, including the NPRPA, and must discuss the reasons for eliminating any alternatives from detailed study. *See id.* §§ 1502.2(d), 1502.14(a).

77.     BLM violated NEPA and its implementing regulations by failing to do an adequate analysis or take a hard look at the potential direct, indirect, and cumulative impacts of its decision or at potential mitigation measures.

78.     BLM failed to consider a reasonable range of alternatives in the EIS, including an alternative that would provide stronger protections for the Reserve's resources and limit the impacts of oil and gas activities, consistent with BLM's statutory

_____

*N. Alaska Envtl. Ctr. v. Bernhardt*
Case No. 3:20-cv-00207-HRH                                    Page 28 of 31

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 28 of 31

obligations. To the extent BLM provided any explanation for failing to consider viable alternatives, that explanation was arbitrary and capricious.

79. For each of the above reasons, and others, BLM's failure to analyze the direct, indirect, and cumulative impacts of its decision, including mitigation measures, and failure to consider a reasonable range of alternatives in its final EIS was arbitrary, capricious, and not in accordance with the law and was without observance of the procedure required by NEPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

## COUNT II
### (Violation of NEPA and the NPRPA)

80. Plaintiffs re-allege, as if fully set forth here, each and every allegation contained in the preceding paragraphs.

81. NEPA requires federal agencies to prepare an EIS on any proposal for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

82. The NPRPA requires that BLM mitigate reasonably foreseeable and significant adverse effects in the Reserve. 42 U.S.C. § 6506a(b). BLM's implementing regulations require BLM to conduct the necessary environmental analysis under NEPA prior to and as part of the tract selection process for the lease sale. 43 C.F.R. § 3131.2(b).

83. Individual lease sales conducted consistent with the IAP are distinct, major federal actions that are subject to NEPA.

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 29 of 31

84.     BLM's statement that the revised IAP is the only NEPA analysis required for the lease sales through at least 2039, absent a need to supplement the IAP based on new information, is contrary to the requirements of NEPA and BLM's regulations under the NPRPA.

85.     Because BLM asserts that the revised IAP satisfies any and all NEPA obligations for future lease sales through at least 2039, the NEPA analysis for such future lease sales is inadequate and BLM has failed to take a hard look at the impacts, including site-specific impacts, associated with those future lease sales.

86.     BLM's failure to conduct an adequate NEPA analysis and failure to articulate a plan consistent with NEPA and the NPRPA was arbitrary, capricious, and not in accordance with the law and was without observance of the procedure required by NEPA, the NPRPA, their implementing regulations, and the APA. 5 U.S.C. § 706(2).

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court grant the following relief:

1.     Declare that BLM violated NEPA, the NPRPA, and the APA, and that the actions as set forth above are arbitrary, capricious, and not in accordance with law and the procedures required by law, and constitute agency action unlawfully withheld or unreasonably delayed;

2.     Vacate and set aside as unlawful the revised IAP and any decisions that stem from or rely on it;

Case 3:20-cv-00207-HRH   Document 1   Filed 08/24/20   Page 30 of 31

3.      Enter appropriate injunctive relief;

4.      Retain continuing jurisdiction of this matter until Federal Defendants fully

remedy the violations of law complained of herein;

5.      Award Plaintiffs all reasonable costs and fees as authorized by law; and

6.      Grant such other relief as this Court deems just and proper.

Respectfully submitted this 24th day of August, 2020,

  s/ Suzanne Bostrom
Suzanne Bostrom (AK Bar No. 1011068)
Brook Brisson (AK Bar No. 0905013)
Bridget Psarianos (AK Bar No. 1705025)
Brian Litmans (AK Bar No. 0111068)
TRUSTEES FOR ALASKA

*Attorneys for Plaintiffs*
